AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Jonathan S. Kim (815) 987-4451



**FILED**
12/16/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

UNITED STATES OF AMERICA

v.

SEAN CLAEYSSEN

CASE NUMBER:
**UNDER SEAL**      **23CR50048**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about November 9, 2023, at Cherry Valley, in the Northern District of Illinois, Western Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a) | Distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

_Danielle Martin_
DANIELLE MARTIN
Special Agent, Drug Enforcement Administration
(DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: December 16, 2023

_Margaret J. Schneider_
_Judge's signature_

City and state: Rockford, Illinois

MARGARET J. SCHNEIDER, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, DANIELLE MARTIN, being duly sworn, state as follows:

1.     I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since approximately July 2017. My current responsibilities include the investigation of narcotics trafficking offenses.

2.     As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the

search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.      This affidavit is submitted in support of a criminal complaint alleging that Sean Claeyssen has violated Title 21, United States Code, Section 841(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CLAEYSSEN with distributing a controlled substance, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

6.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and from persons with knowledge regarding relevant facts.

7.      The United States, including the DEA, is conducting a criminal investigation of Sean CLAEYSSEN.

8.      Specifically, the DEA Rockford Resident Office and the Beloit, Wisconsin Police Department ("investigating agents") are investigating a drug

trafficking organization ("DTO") operating in Winnebago County, Illinois, led by CLAEYSSEN. Based on the investigation to date, investigating agents believe the DTO is responsible for transporting and distributing controlled substances throughout the northern Illinois and southern Wisconsin area.

9.      Investigating agents have identified CLAEYSSEN as the leader of the DTO. The investigation into CLAEYSSEN began in September of 2023 when Beloit Police Department (BPD) Violent Crimes Interdiction Team officers were provided with information from a confidential informant (CI)[1] regarding Sean CLAEYSSEN. The CI advised officers that CLAEYSSEN is involved in the distribution of pound quantities of crystal methamphetamine in Cherry Valley, Illinois and Beloit, Wisconsin. The CI advised that he/she has purchased amounts up to a half-pound of methamphetamine (that the CI was later able to distribute) from CLAEYSSEN on multiple occasions over the past year. The CI advised officers that CLAEYSSEN has conducted narcotics transactions with the CI at CLAEYSSEN's residence in Cherry Valley, Illinois and at the CI's residence in Beloit, Wisconsin. The CI advised officers that the CI could purchase methamphetamine from CLAEYSSEN in the future.

10.      On October 2, 2023, investigating agents conducted a debriefing of the CI. The CI relayed to investigating agents that he/she has known CLAEYSSEN for approximately one year and has purchased methamphetamine from CLAEYSSEN on numerous occasions. The CI provided investigating agents the telephone number for

---

[1] CI has two misdemeanor convictions of DUI and a misdemeanor conviction of disorderly conduct. CI is working as a confidential informant in exchange for lowering or dropping state narcotics charges.

CLAEYSSEN. The CI stated that CLAEYSSEN typically delivers the methamphetamine to the CI and that CLAEYSSEN drives a gray Honda Accord. The CI stated that he/she could purchase a half-pound of methamphetamine from CLAEYSSEN for approximately $2,300.00. The CI further stated that he/she would be willing to introduce an undercover officer (UC) to CLAEYSSEN.

11.     From October to December 2023, investigating agents, utilizing the CI and UC, conducted four controlled purchases of methamphetamine and cocaine.

**October 24, 2023 Controlled Purchase of Methamphetamine from CLAEYSSEN by the CI and UC**

12.     On October 23, 2023, the CI advised investigating agents that CLAEYSSEN offered to sell the CI and the CI's "associate" (UC) a half-pound of methamphetamine the following day (October 24, 2023) in exchange for $2,300.00 U.S. currency.

13.     On October 24, 2023, investigating agents met with the CI at a predetermined location in anticipation of the methamphetamine transaction with CLAEYSSEN.

14.     On this same date, at approximately 12:40 p.m., the CI placed several recorded telephone calls to CLAEYSSEN, in the presence of investigating agents, to confirm the methamphetamine transaction for that day. A male subject answered the phone and spoke with the CI. Following the call, the CI advised officers that the subject on the phone that he/she spoke with was CLAEYSSEN and that CLAEYSSEN agreed to conduct the methamphetamine transaction at his residence. The CI relayed that CLAEYSSEN previously provided his address to the CI, and that the CI has met

CLAEYSSEN at his residence in the past. A portion of the recorded conversation went as follows:

> CLAEYSSEN - Huh? I can still meet you and give you what I got and then I can come to Beloit and give you the rest.
>
> CI - Um…yeah, he don't, he don't want the money to leave his hands.
>
> CLAEYSSEN - Well he ain't gotta come off of no money, I mean, I'll, you know, I'll give him what I got and then I'll just go get the rest and then I'll bring it to you. You ain't gotta give me no extra money.
>
> CI - Alright, if you wanna do it that way, that's fine.
>
> CLAEYSSEN – Alright.
>
> CI - Hey, how much you want for that?
>
> CLAEYSSEN - For the.. for the 4?
>
> CI – Yeah.
>
> CLAEYSSEN- Uh, just uh, normal.
>
> CI – Alright.
>
> CLAEYSSEN - Alright, um, well then I'll just go back to the house real quick and I'll just meet you there.
>
> CI - Alright, we should be there in a few minutes.
>
> CLAEYSSEN – Alright.

The CI further explained that CLAEYSSEN agreed to conduct the quarter-pound ("4" meaning four ounces) methamphetamine transaction that same day and that CLAEYSSEN would deliver the remaining quarter-pound to the CI in Beloit, Wisconsin at a later time.

15.     Following the call with CLAEYSSEN, the CI was searched by investigating agents and found to be free of narcotics, weapons, or any other

contraband. The UC took custody of $2,300.00 DEA Official Advanced Funds for the purpose of purchasing methamphetamine from CLAEYSSEN. The UC was also in possession of an audio recording device. Investigating agents subsequently established surveillance at CLAEYSSEN's residence, in anticipation of the meeting between the CI, UC, and CLAEYSSEN.

16.     At approximately 12:57 p.m., a BPD officer observed a gray Honda Accord parked on the south side of CLAEYSSEN's residence. The officer further observed a male subject resembling CLAEYSSEN who appeared to be working on the aforementioned vehicle. Shortly after, the male subject entered the residence.

17.     At approximately 1:07 p.m., the CI and UC arrived at CLAEYSSEN's residence in the UC vehicle and parked in the alley on the south side of CLAEYSSEN's residence. Shortly after, a BPD officer observed someone approach the passenger side of the UC vehicle and talk with the CI. Shortly after, that person departed the area of the UC vehicle.

18.     At approximately 1:10 p.m., a BPD officer observed a male subject exit CLAEYSSEN's residence and approach the CI at the UC vehicle. The male subject was later confirmed by the UC to be CLAEYSSEN.

19.     At approximately 1:18 p.m., a BPD officer observed CLAEYSSEN depart the area of the UC vehicle. Shortly after, the UC and CI departed CLAEYSSEN's residence in the UC vehicle. Investigating agents maintained visual of the UC vehicle until it arrived at the DEA office. Shortly after, investigating agents terminated surveillance at CLAEYSSEN's residence.

20.     At the DEA office, investigating agents conducted a debriefing with the UC and CI. The UC stated that upon arriving, the CI was approached by Individual A and had a short conversation with Individual A. Shortly after, CLAEYSSEN exited the residence and approached the front passenger window of the UC vehicle. While at the passenger window, CLAEYSSEN removed a plastic bag containing suspected crystal methamphetamine from his pants pocket and placed it on the CI's lap. The UC and CLAEYSSEN negotiated the price for the methamphetamine and the UC subsequently paid CLAEYSSEN $1,200.00 Official Advance Funds for the approximate quarter-pound of methamphetamine. CLAEYSSEN further stated that his source of supply was in route to the area from Chicago, and that CLAEYSSEN could sell the UC an additional quarter-pound of methamphetamine at a later time.

21.     The plastic bag containing suspected crystal methamphetamine was placed into evidence at the DEA for safekeeping. The suspected methamphetamine weighed approximately 143 grams and field tested positive for the probable presence of methamphetamine. Investigating agents also reviewed the audio recording from the controlled purchase and confirmed the information relayed from the CI and UC.

22.     The methamphetamine was analyzed by a forensic scientist at a crime laboratory, yielding the following results: 110.2 grams of methamphetamine with 97% substance purity.

### October 25, 2023 Methamphetamine Transaction with CLAEYSSEN by the CI

23.     On October 25, 2023, the CI informed investigating agents that the CI received a call from CLAEYSSEN. The CI advised that CLAEYSSEN would be

dropping off the additional quarter-pound of methamphetamine at the CI's residence in Beloit, Wisconsin that same day.

24.     On this same date, at approximately 3:00 p.m., DEA agents established surveillance at CLAEYSSEN's residence.

25.     At approximately 4:46 p.m., an investigating agent observed a gray Honda Accord bearing Illinois license plate EC94489 depart CLAEYSSEN's residence. Law enforcement databases showed that Illinois license plate EC94489 is registered to Individual A, 717 Elgin St, Cherry Valley, IL 61016. Investigating agents maintained surveillance of the Honda Accord and confirmed that CLAEYSSEN was the driver of the aforementioned vehicle as it travelled north on Interstate 90 towards Wisconsin. The vehicle was also occupied by a female passenger.

26.     While conducting mobile surveillance of CLAEYSSEN, BPD officers met with the CI and searched the CI's person and residence prior to CLAEYSSEN arriving. The residence and CI's person were negative for narcotics, weapons, or other contraband. The CI was also provided with an audio and video recording device. BPD officers subsequently established surveillance at the CI's residence in anticipation of the CI meeting with CLAEYSSEN. During this time, DEA agents maintained visual of CLAEYSSEN's Honda Accord until it arrived at the CI's residence.

27.     At approximately 5:19 p.m., a BPD officer observed CLAEYSSEN's Honda Accord arrive the CI's residence and park in the driveway. Several minutes

later, a BPD officer observed CLAEYSSEN exit the driver's seat of the Honda Accord and walk toward the CI's detached garage.

28.     Shortly after, BPD officers observed an unknown female exit a vehicle nearby and walk toward the CI's garage.

29.     At approximately 5:45 p.m., a BPD officer observed CLAEYSSEN walk towards the Honda Accord, enter the driver's seat, and depart the CI's residence. Investigating agents maintained surveillance of CLAEYSSEN until confirming he was out of the area. Shortly after, BPD officers observed the unknown female depart from the CI's garage.

30.     At approximately 6:00 p.m., after confirming the unknown female was out of the area, BPD officers met with the CI to conduct a debriefing. BPD officers took custody of the audio/video recording device and a clear plastic bag containing suspected methamphetamine from the CI's garage. The CI and CI's residence were searched, which yielded negative for any other narcotics, weapons, or contraband. The CI advised BPD officers that CLAEYSSEN walked into the CI's garage and removed the clear plastic bag containing the suspected methamphetamine from his waistband and placed it on a work bench. The CI stated that he/she did not provide any currency to CLAEYSSEN for the methamphetamine. The CI stated that the female who entered the garage after CLAEYSSEN arrived was a friend and unrelated to the methamphetamine transaction. The CI stated that he/she placed a handkerchief over the methamphetamine to conceal it from the female. Shortly after, investigating agents departed the area.

31.     BPD officers transferred custody of the plastic bag containing suspected crystal methamphetamine and the audio/video recording device to DEA, which was then transported to the DEA office for safekeeping. The suspected methamphetamine weighed approximately 126 grams and field tested positive for the probable presence of methamphetamine. Investigating agents also reviewed the audio/video recording from the methamphetamine transaction and confirmed the information relayed from the CI.

32.     The methamphetamine was analyzed by a forensic scientist at a crime laboratory, yielding the following results: 114.0 grams of methamphetamine with 97% substance purity.

**October 27, 2023 Undercover Payment to CLAEYSSEN**

**33.**     On October 26, 2023, at approximately 7:50 p.m., the UC placed a recorded telephone call to CLAEYSSEN. The UC informed CLAEYSSEN that he received the quarter-pound of methamphetamine from the CI and had CLAEYSSEN's payment ready. During the call, CLAEYSSEN agreed to meet the UC on October 27, 2023 to collect the payment. A portion of the recorded telephone call went as follows:

CLAEYSSEN - What's going on man?

UC - I just wanted to touch base with you. I talked to [the CI] a little while ago. Um, I picked up that other shit. I got what I owe you man.

CLAEYSSEN – Alright.

UC - I didn't wanna leave that shit there, you know, I try not to let that shit touch too many hands you know.

CLAEYSSEN – Right.

UC - I'm going to see my girl tomorrow. I don't know if you gonna be around.

CLAEYSSEN - Um…yeah. Well, depends on what time cause, uh…you know what…fuckin crazy, I'm actually comin to Madison tomorrow.

UC - Oh for real.

CLAEYSSEN - Yeah, my girlfriend, uh, my girlfriend's sister is…she just got out here, or out there tonight, she's visiting from uh, California. She's visiting her boyfriend or whatever.

UC - Ok ok.

CLAEYSSEN - So…we're supposed to go out there and meet her.

UC - Ok, do you wanna hit me up in the morning and then we'll figure that shit out?

CLAEYSSEN- Yeah, yeah, yeah. That's cool. Alright, so are you good with everything though? Like you don't need no more or what?

UC - I'm good for, you know, a little bit.

**34.** On October 27, 2023, at approximately 12:02 p.m., the UC placed a recorded telephone call to CLAEYSSEN. The UC informed CLAEYSSEN that the UC was ready to meet. CLAEYSSEN agreed to conduct the meeting at CLAEYSSEN's residence and advised the UC that he would text the UC his address. Shortly after, the UC received a text message, which read, "717 Elgin St."

**35.** At approximately 12:25 p.m., DEA agents established surveillance at CLAEYSSEN's residence in anticipation of the UC meeting with CLAEYSSEN. The UC took custody of $1,200.00 Official Advanced Funds and travelled to CLAEYSSEN's residence to meet with CLAEYSSEN.

**36.** At approximately 12:30 p.m., investigating agents observed the UC vehicle arrive at CLAEYSSEN's residence and park on the south side of the residence.

Approximately ten minutes later, investigating agents observed the UC depart CLAEYSSEN's residence in the UC vehicle.

37. Investigating agents maintained visual of the UC vehicle until arriving at the DEA office. Investigating agents conducted a debriefing of the UC. The UC advised that upon arriving at CLAEYSSEN's residence, CLAEYSSEN was outside in the driver's seat of the gray Honda Accord and indicated to the UC to walk over. The UC exited the UC vehicle and approached CLAEYSSEN's driver's side window. The UC provided CLAEYSSEN with the $1,200.00 Official Advanced Funds as payment for the methamphetamine. While conversating, CLAEYSSEN retrieved a cup from near the inside of the driver's side door. CLAEYSSEN then removed a clear plastic bag from inside the cup, which contained a white crystal-like substance, and showed it to the UC. CLAEYSSEN informed the UC that he just picked up that "half." Based on the UC's training and experience, the UC believes the substance was approximately a half-pound of suspected methamphetamine. CLAEYSSEN further advised that he would check into pricing for fentanyl M-30 pills and ounces of cocaine for the UC. CLAEYSSEN also relayed that his cocaine source of supply is a Puerto Rican male who works as a barber.

38. On October 31, 2023, the UC placed a recorded telephone call. During the call, CLAEYSSEN advised the UC that he spoke to his barber about "snow," meaning cocaine. CLAEYSSEN advised that he could sell the UC an ounce of cocaine for $1,000.00. CLAEYSSEN further stated that his source of supply for M-30 fentanyl pills was acting "weird" and that he was going to reach out to a different individual

about obtaining pills and pricing. The UC advised CLAEYSSEN that he would reach out to him at a later date about setting up another transaction. A portion of the recorded telephone call went as follows:

UC: What's good, bro?

CLAEYSSEN: Not shit. Um, hey so I was, I went to get my haircut last night and, uh, I was talking to my barber, um, about the, um, the snow.

UC: Uh-huh.

CLAEYSSEN: And, uh, if you were gonna, um, want that, um.. I told you a grand last time, right?

UC: Yeah.

CLAEYSSEN: Yeah, if you wanna grab that I can do that. You just gotta give me a heads up like a few days before.

UC: Ok, that same price?

CLAEYSSEN: Yeah, yup.

UC: Ok.

CLAEYSSEN: Yeah, as it stands right now, yeah that's what he told me, so…

UC: Ok, you said what, you need a couple days?

CLAEYSSEN: Uh, well yeah, like at least two days.

UC: Yeah, yeah for sure.

[*The recorded call abruptly ends. The UC then calls CLAEYSSEN back*]

CLAEYSSEN: Yo.

UC: My bad dude. I don't know if I hung up on you.

CLAEYSSEN: Yeah I was definitely just sitting here talking to myself.

UC: My bad.

13

CLAEYSSEN: No, you're good.

UC: Were you able to check on the blue or no?

CLAEYSSEN: Yeah, so that's what I was saying. I almost fucking got 30 of them, but, I almost got 30 of them the other day but the dude, he was acting real funny and shit so I, it was somebody I didn't know, it was just through one of my buddies, and he was acting all weird and shit and I was just like nah, I'm good man fuck that shit. So I'm still waiting to talk to my, um, my main guy to see if uh…have you ever seen them white, the white ones?

UC: No, I've seen blue and I've seen green.

CLAEYSSEN: Yeah, I just started hearing about these white ones that were going around. Supposedly they're decent, I mean I don't know.

UC: Ok.

CLAEYSSEN: But like I said I'll holler at my dude and see if he can just throw me a couple and then I'll just give them to you and, you know you can do what you're gonna do with them and then let me know what's to them and you know, if you wanna do something after that then we can work something out.

UC: Ok, yeah that sounds good.

### November 9, 2023 Controlled Purchase of Methamphetamine from CLAEYSSEN by the UC

39.    As alleged in the criminal complaint, CLAEYSSEN distributed a controlled substance (methamphetamine) on or about November 9, 2023.

40.    On November 7, 2023, the UC was in contact with CLAEYSSEN to discuss a future methamphetamine transaction. CLAEYSSEN advised the UC that he could provide the UC with one pound of methamphetamine in exchange for $4,250.00 at a later date. A portion of the recorded conversation with CLAEYSSEN is as follows:

CLAEYSSEN: Hello?

UC: Hey, you hear me?

CLAEYSSEN: What's up bro?

UC: Hey, what's going on dude?

CLAEYSSEN: Not much, what's going on?

UC: Oh not shit. Um.. Yeah I haven't talked to you in a minute. Tried to reach out a little bit ago. Hey, how much you want for a full one?

CLAEYSSEN: For a full one?

UC: Yeah.

CLAEYSSEN: Umm… think I'm gonna be looking at like… probably about… uh I could do probably…. Like 4….. uh, be about 4, 4250.

UC: $4,250 is what you're at? Alright. Ok that works. I'm not ready yet. I gotta get some shit in order. I gotta make a couple phone calls here.

CLAEYSSEN: Alright.

UC: Yeah, that'll work.

41.     On November 8, 2023, the UC placed a recorded call to CLAEYSSEN. CLAEYSSEN agreed to meet the UC the following day (November 9, 2023) to conduct the one pound methamphetamine transaction. CLAEYSSEN also advised that he made a mistake on the price and that it will be $4,500.00 for one pound. A portion of the recorded conversation with CLAEYSSEN is as follows:

CLAEYSSEN: Hello?

UC: Hey what's good bro?

CLAEYSSEN: Hey what's up man?

UC: Sorry if I woke you up man.

15

CLAEYSSEN: No you're good.

UC: I was just checking, you gonna be around tomorrow?

CLAEYSSEN: Yeah. What were, were you needing, um…what you were talking about just yesterday or the day before?

UC: Yeah.

CLAEYSSEN: Alright, um…

UC: Yeah, the full.

CLAEYSSEN: Cause I, I kinda…yeah. I…when you called me I had just, was just kinda waking up. Cause I called my dude to make sure, you know, that he was gonna have that and…

UC: Uh-huh.

CLAEYSSEN: He said yeah but, I don't, what did I, what did I tell you?

UC: Uh…4,250.

CLAEYSSEN: Well, yeah, yeah that is kinda, well…it's my, it's a fuck up on my end.

UC: It's all good, is that a little low?

CLAEYSSEN: Yeah…it really and it was only, it was so...technically cause I'm, that's almost what I'm getting taxed.

UC: Ok.

42.     On November 9, 2023, the UC placed a recorded call to CLAEYSSEN at and advised CLAEYSSEN that he was ready to meet. CLAEYSSEN stated that he was currently having his tire fixed but instructed the UC to head to CLAEYSSEN's residence. A portion of the recorded conversation with CLAEYSSEN is as follows:

CLAEYSSEN: Yo

UC: Hey what's good bro

CLAEYSSEN: Not much, what's the word?

UC: I'm ready man. You around?

CLAEYSSEN: Yeah, uh, I'm at…I'm in Rockford right now I was just getting a new tire put on this rim, uh, for one of my other cars.

UC: Ok

CLAEYSSEN: But uh, and that shit won't take nothing but a couple minutes so it'll probably be done in the next 10 minutes so. So I mean if you wanna head out, uh, over my way, we'll probably, well I'll be out there by the time you get out there for sure.

UC: Ok. Ok, yeah I'll give it a couple minutes and then I'll head that way

CLAEYSSEN: Alright man sounds good

43.     At approximately 1:41 p.m., DEA agents established surveillance at CLAEYSSEN's residence in anticipation of the methamphetamine transaction with CLAEYSSEN. The UC took custody of $4,500.00 Official Advanced Funds and travelled to CLAEYSSEN's residence to meet with CLAEYSSEN.

**44.**     At approximately 1:49 p.m., investigating agents observed the UC vehicle arrive at CLAEYSSEN's residence and park on the south side of the residence. Approximately fourteen minutes later, investigating agents observed the UC depart CLAEYSSEN's residence in the UC vehicle. Shortly after, surveillance at CLAEYSSEN's residence was terminated.

45.     Investigating agents maintained visual of the UC vehicle until arriving at the DEA office. Investigating agents conducted a debriefing of the UC. The UC advised that upon arriving at CLAEYSSEN's residence, CLAEYSSEN was sitting in

the driver's seat of the gray Honda Accord. The gray Honda Accord was parked in the grass on the north side of the alley. An unknown male was sitting in the front passenger seat of the Honda. CLAEYSSEN exited the Honda Accord and entered the front passenger seat of the UC vehicle. CLAEYSSEN directed the UC to park behind the Honda Accord. CLAEYSSEN showed the UC a plastic bag containing a white powdery substance, which CLAEYSSEN purported to be cocaine. CLAEYSSEN offered for the UC to sample the alleged cocaine to test the quality. After further discussion, CLAEYSSEN removed a different large clear plastic bag containing suspected methamphetamine from his sweatshirt pocket. CLAEYSSEN provided the bag to the UC. In exchange, the UC provided CLAEYSSEN $4,500.00 Official Advanced Funds. During further conversation, CLAEYSSEN stated that he does not have a job and that "this" is his job, meaning selling drugs.

46. The suspected methamphetamine weighed approximately 481 grams and field tested positive for the probable presence of methamphetamine. Investigating agents also reviewed the audio/video recording from the controlled purchase and confirmed the information relayed from the UC.

47. The methamphetamine was analyzed by a forensic scientist at a crime laboratory, yielding the following results: 445.2 grams of methamphetamine with 99% substance purity.

**November 28, 2023 Evidence Recovered from the Trash**

48. On November 28, 2023, investigating agents conducted a trash recovery from CLAEYSSEN's residence. Fourteen trash bags were retrieved from the garbage

can, which was located along the alley on the south side of the residence. A search of the trash bags revealed numerous plastic sandwich bags, black disposable gloves, and used syringes. One of the plastic sandwich bags contained a white residue on the inside and field tested positive for the probable presence of cocaine. Investigating agents also observed that several of the used syringes contained a small amount of an unknown off-white substance. The contents of two of the used syringes field tested positive for the probable presence of fentanyl. Based on my training and experience, I know that drug traffickers typically use disposable gloves and plastic bags for packaging narcotics for distribution. In addition, I know that drug traffickers often sell narcotics to support their own addiction. Based on the used syringes and positive field test for the probable presence of fentanyl, investigating agents believe that it is likely that CLAEYSSEN or another occupant at CLAEYSSEN's residence used the syringes to inject illegal narcotics.

### December 4, 2023 Controlled Purchase of Cocaine and Methamphetamine from CLAEYSSEN by the UC

49.     During prior conversations between the UC and CLAEYSSEN, CLAEYSSEN offered to sell the UC cocaine. CLAEYSSEN stated that he could provide the UC one ounce of cocaine for $1,000.00. From December 1-4, 2023, the UC spoke with CLAEYSSEN regarding purchasing a "zip" (one ounce of cocaine) from CLAEYSSEN. The text conversation between the UC and CLAEYSSEN went as follows:

**December 1, 2023**

CLAEYSSEN: Yo

UC: Whats up man I was just about to hit u up. U think I can get that zip in a few days? Like Monday?

**December 3, 2023**

UC: Whats good

CLAEYSSEN: Not much. I can see about that for you. Were you needing the normal shit too or just the zip

UC: Just the zip if we can do it tomorrow, im going to texas on Tuesday and got someone looking for that before I go down there if possible. Should be ready for that normal when i get back

**December 4, 2023**

CLAEYSSEN: When will you be coming back?? And I have that for you already.

UC: Ill be back saturday. U got the zip or the normal already?

UC: Whats up hows it looking?

CLAEYSSEN: Well I have both. But I had to get it on a front, so he taxed me a lil extra but it was just an extra 100. If you cool with it maybe you could split that with me?? But ya I have whatever you need bro

UC: Shit I can cover that 100 if you can throw me a little of the normal with it

The UC and CLAEYSSEN subsequently agreed to conduct the cocaine transaction on December 4, 2023. CLAEYSSEN advised the UC that he was "taxed" $100.00 by his cocaine source of supply and asked to split the extra $100.00 fee with the UC. The UC stated that he would pay the $100.00 if CLAEYSSEN would include some methamphetamine.

50.     On December 4, 2023, following the text conversation with CLAEYSSEN, the UC tried calling CLAEYSSEN to arrange a meeting time, but CLAEYSSEN did not answer.

51.     On this same date, at approximately 1:55 p.m., investigating agents established surveillance at CLAEYSSEN's residence in anticipation of the UC meeting with CLAEYSSEN. Investigating agents observed that CLAEYSSEN's Honda Accord was parked on the south side of the residence.

52.     The UC subsequently took custody of $1,100.00 Official Advanced Funds and traveled to CLAEYSSEN's residence in attempt to meet with CLAEYSSEN.

53.     At approximately 2:36 p.m., investigating agents observed the UC vehicle arrive at CLAEYSSEN's residence. The UC then placed another recorded call to CLAEYSSEN. The UC advised CLAEYSSEN that the UC was outside his residence and CLAEYSSEN relayed that he would be right out to meet with him.

54.     At approximately 2:42 p.m., investigating agents observed CLAEYSSEN, who was wearing a red sweatshirt, exit the door on the west side of the residence. Investigating agents then observed CLAEYSSEN enter the front passenger seat of the UC vehicle and meet with the UC. Investigating agents monitored the UC live audio recording during the meeting with CLAEYSSEN.

55.     At approximately 2:44 p.m., investigating agents observed CLAEYSSEN briefly exit the UC vehicle and heard CLAEYSSEN yell to Individual A to get a "calculator." Shortly after, investigating agents observed someone exit the

garage and walk to the passenger side of the UC vehicle. That person then returned to the garage.

56.    At approximately 2:49 p.m., investigating agents observed CLAEYSSEN exit the UC vehicle and enter the same door of the west side of his residence. Shortly after, the UC departed CLAEYSSEN's residence. Investigating agents maintained visual of the UC vehicle until arriving at the DEA office.

57.    At the DEA office, investigating agents conducted a debriefing of the UC. The UC advised that upon arriving at CLAEYSSEN's residence, the UC spoke with CLAEYSSEN over the phone. CLAEYSSEN advised that he would be right out to meet with the UC. The UC stated that CLAEYSSEN exited his residence shortly after and entered the UC vehicle. The conversation between CLAEYSSEN and the UC was audio recorded. The UC stated that, while conversing, CLAEYSSEN removed a plastic bag containing suspected cocaine and a second plastic bag containing suspected crystal methamphetamine from his sweatshirt pocket. The UC then asked CLAEYSSEN if he had a scale to weigh the cocaine. CLAEYSSEN briefly exited the UC vehicle and yelled to Individual A to bring his "calculator." Shortly after, Individual A exited the garage, walked to the UC vehicle, and handed CLAEYSSEN a small scale through the passenger window. CLAEYSSEN and the UC then weighed the suspected cocaine to confirm the amount. The UC took possession of the suspected cocaine and methamphetamine and provided CLAEYSSEN with the $1,100.00 Official Advanced Funds. The UC also stated that CLAEYSSEN informed the UC he just received a half pound of methamphetamine.

58.    The suspected cocaine weighed approximately 61.7 grams and field tested positive for the probable presence of cocaine. The suspected crystal methamphetamine weighed approximately 39.6 grams and field tested positive for the probable presence of methamphetamine.

59.    Based on the foregoing facts, I respectfully submit that there is probable cause to believe that on or about November 9, 2023, at Cherry Valley, in the Northern District of Illinois, Western Division, Sean CLAEYSSEN committed the offense of distributing a controlled substance (methamphetamine).

FURTHER AFFIANT SAYETH NOT.

DANIELLE MARTIN
Special      Agent,      Drug      Enforcement
Administration

SWORN TO AND AFFIRMED by telephone December 16, 2023.

Honorable MARGARET J. SCHNEIDER
United States Magistrate Judge

23